# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLORADO

Civil Action No. _____

PRECY LOPEZ,

    Plaintiff,

v.

UQM TECHNOLOGIES, INC., DONALD W. VANLANDINGHAM, JOSEPH R. MITCHELL, STEPHEN J. ROY, JOSEPH P. SELLINGER, and JOHN E. SZTYKIEL,

    Defendants.

---

**COMPLAINT FOR VIOLATION OF SECTIONS 14(a) AND 20(a) OF THE SECURITIES EXCHANGE ACT OF 1934**

---

Precy Lopez ("Plaintiff"), by and through her attorneys, alleges the following upon information and belief, including investigation of counsel and review of publicly-available information, except as to those allegations pertaining to Plaintiff, which are alleged upon personal knowledge:

## NATURE OF THE ACTION

1. This is an action brought by Plaintiff against UQM Technologies, Inc. ("UQM" or the "Company") and the members of the Company's board of directors (collectively referred to as the "Board" or the "Individual Defendants" and, together with UQM, the "Defendants") for their violations of Sections 14(a) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. §§ 78n(a), 78t(a) respectively, and United States Securities and Exchange Commission ("SEC") Rule 14a-9, 17 C.F.R. § 240.14a-9. Plaintiff's claims arise in connection with the proposed

acquisition of UQM by Danfoss A/S ("Danfoss") through its wholly-owned subsidiary, Danfoss Power Solutions (US) Company ("Parent").

2.  On January 21, 2019, UQM entered into an Agreement and Plan of Merger (the "Merger Agreement") with Parent and Danfoss-2019 Merger Sub, Inc., a Delaware corporation and a wholly-owned subsidiary of Parent (the "Merger Sub"), pursuant to which Merger Sub will be merged with and into the Company, as a result of which the Company will continue as the surviving corporation and a wholly-owned subsidiary of Parent (the "Proposed Transaction").

3.  Under the terms of the Merger Agreement, each issued and outstanding share of UQM's common stock will be cancelled and converted into the right to receive $1.71 per share in cash (the "Merger Consideration").

4.  On February 11, 2019, in order to convince UQM's public common shareholders to vote in favor of the Proposed Transaction, Defendants authorized the filing of a materially incomplete and misleading Schedule 14A Preliminary Proxy Statement (the "Proxy") with the SEC, in violation of Sections 14(a) and 20(a) of the Exchange Act.

5.  In particular, the Proxy contains materially incomplete and misleading information concerning: (i) financial projections for UQM; (ii) the valuation analyses performed by the UQM's financial advisor, Duff & Phelps, LLC ("Duff & Phelps"), in support of its fairness opinion; (iii) the sales process leading up to the Proposed Transaction; and (iv) the potential conflict of interest Duff & Phelps faced as a result of its historical dealings with UQM.

6.  The special meeting of the Company's shareholders to vote on the Proposed Transaction is quickly approaching as UQM anticipates that the Proposed Transaction will be completed during UQM's second fiscal quarter of 2019, ending June 30, 2019. It is therefore imperative that the material information that has been omitted from the Proxy is disclosed prior to special meeting of UQM's shareholders to vote on the Proposed Transaction so Plaintiff can properly

exercise her corporate voting rights.

7. For these reasons, and as set forth in detail herein, Plaintiff asserts claims against Defendants for violations of Sections 14(a) and 20(a) of the Exchange Act and Rule 14a-9. Plaintiff seeks to enjoin Defendants from taking any steps to consummate the Proposed Transaction unless and until the material information discussed below is disclosed to UQM's public common shareholders sufficiently in advance of the special meeting of UQM's shareholders or, in the event the Proposed Transaction is consummated, to recover damages resulting from the Defendants' violations of the Exchange Act.

## JURISDICTION AND VENUE

7. This Court has subject matter jurisdiction pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1331 (federal question jurisdiction) as Plaintiff alleges violations of Sections 14(a) and 20(a) of the 1934 Act and Rule 14a-9.

8. Personal jurisdiction exists over each Defendant either because the Defendant conducts business in or maintains operations in this District, or is an individual who is either present in this District for jurisdictional purposes or has sufficient minimum contacts with Colorado as to render the exercise of jurisdiction over the Defendant by this Court permissible under traditional notions of fair play and substantial justice.

9. Venue is proper in this District under Section 27 of the Exchange Act, 15 U.S.C. § 78aa, as well as under 28 U.S.C. § 1391, because: (i) the Defendants can be found, are inhabitants of, or transact business in this District; (ii) the conduct at issue had an effect in this District; (iii) UQM is incorporated within this District; and (iv) Defendants have received substantial compensation via UQM by doing business through, with and for UQM, which is a Colorado corporation that maintained its principal office in Colorado at 4120 Specialty Place, Longmont, Colorado 80504.

## PARTIES

10.     Plaintiff is, and has been continuously throughout all times relevant hereto, the owner of UQM common stock.

11.     Defendant UQM is a Colorado corporation with its principal place of business located at 4120 Specialty Place, Longmont, Colorado 80504.  The Company develops and manufactures electric motors, generators, and power electronics.  UQM's common units trade on the NYSE under the ticker symbol "UQM."

12.     Defendant Donald W. Vanlandingham is, and has been at all relevant times, a director of the Company.  Defendant Vanlandingham also currently serves as Chairman of the Board.

13.     Defendant Joseph R. Mitchell is, and has been at all relevant times, a director of the Company.  Defendant Mitchell is also the President and Chief Executive Officer of the Company.

14.     Defendant Stephen J. Roy is, and has been at all relevant times, a director of the Company.

15.     Defendant Joseph P. Sellinger is, and has been at all relevant times, a director of the Company.

16.     Defendant John E. Sztykiel is, and has been at all relevant times, a director of the Company.

17.     The defendants identified in paragraphs 12 through 16 are collectively referred to herein as the "Board" or the "Individual Defendants," and together with UQM, the "Defendants."

## SUBSTANTIVE ALLEGATIONS

**Background of the Company and the Proposed Transaction**

18.     UQM develops, manufactures, and sells power dense, high efficiency electric motors, generators, power electronic controllers and fuel cell compressors for the commercial truck, bus, automotive, marine, and industrial markets.  The Company generates revenue from two principal

activities: 1) the sale of motors, generators, electronic controls, and fuel cell compressors; and 2) research, development, and application engineering contract services.  UQM product sales consist of annually recurring volume production, prototype low volume sales, and revenues derived from the sale of refurbished and serviced products.  The sources of engineering service revenue typically vary from year to year and individual projects may vary substantially in their periods of performance and aggregate dollar value.

19. Danfoss is a multi-industry technology provider divided into four business segments: Danfoss Power Solutions, Danfoss Cooling, Danfoss Drives, and Danfoss Heating.

20. On January 21, 2019, the Board caused the Company to enter into the Merger Agreement.

21. Pursuant to the terms of the Merger Agreement, UQM's shareholders will only receive $1.71 per share in cash for each unit of UQM common stock they hold.

22. According to the January 21, 2019, press release announcing the Proposed Transaction:

**UQM Technologies Signs Definitive Agreement to be Acquired by Danfoss**

*UQM Stockholders to Receive $1.71 per Share in Cash; Conference Call January 22, 2019 at 8:30 a.m. Eastern*

**LONGMONT, COLORADO, JANUARY 21, 2019** — UQM Technologies, Inc. **(NYSE American: UQM) ("UQM" or the "Company")**, a developer of alternative energy technologies, today announced that it has entered into a definitive merger agreement with the Danfoss Power Solutions (US) Company, a wholly-owned subsidiary of Denmark-based Danfoss A/S ("Danfoss"), under which Danfoss will acquire all outstanding common shares of UQM for $1.71 per share in an all-cash transaction valued at approximately $100 million, including the assumption of UQM's debt. Danfoss, a privately-owned multinational company with reported sales of €5.8 billion in 2017 (2018 full year results to be released on February 28), is a leading manufacturer of hydraulic systems, drives, motors, and components for the automotive, aerospace, HVAC, and energy industries. The merger anticipates that UQM will become part of the Danfoss Power Solutions segment.

The cash consideration represents a premium of approximately 52.5% over UQM's closing share price on January 18, 2019 and a 71.4% premium to its weighted average trading price over the trailing 60 days. The transaction will be funded with Danfoss' cash on hand and is not subject to any financing condition. The merger agreement was unanimously agreed to by the Boards of Directors of both UQM and Danfoss; GDG Green Dolphin, LLC — which holds approximately 7.4% of the issued and outstanding shares of UQM — and all UQM directors and officers have executed Voting and Support Agreements in favor of the acquisition. Closing of the transaction is subject to approval by two-thirds of UQM shareholders and by the Committee on Foreign Investment in the United States ("CFIUS") as well as other customary closing conditions.

Joe Mitchell, UQM Technologies' President and Chief Executive Officer, stated, "We believe UQM will be an excellent addition to Danfoss as our products, business model, strategy and focus are closely aligned. Being part of a larger global enterprise will greatly improve our position to compete with other international players, open doors to new markets, and provide critical resources for UQM to continue developing the highly-engineered electric propulsion products we're known for today. We believe the transaction positions UQM well for the future — particularly in key geographies such as China and India, where Danfoss already operates — and provides an attractive return for our shareholders. We're proud of our many accomplishments and look forward to a future with Danfoss, with which we can enhance service for our customers, invest in technology, and adapt to the ever-changing dynamics of our core markets."

Kim Fausing, President & CEO of Danfoss, added, "It is a great pleasure to announce this transaction with UQM, which will position Danfoss for even stronger performance in the industries we serve. We see fast-growing demand for electric solutions within buses and trucks, off-highway vehicles, and marine markets in response to the more stringent emission regulations being imposed — stimulating interest in the efficiency and productivity gains our solutions bring. With an established North American presence, UQM will complement our global sales and manufacturing footprint nicely, further cementing our strong position in the marine as well as on- and off-highway markets. I look forward to welcoming the UQM team to Danfoss and our business."

The transaction is expected to close in the second quarter of 2019, subject to approval by UQM's shareholders and CFIUS.

**The Proxy Omits Material Information**

23. On February 11, 2019, Defendants filed a materially incomplete and misleading Proxy with the SEC. The Individual Defendants were obligated to carefully review the Proxy before it was filed with the SEC and disseminated to the Company's shareholders to ensure that it did not contain any material misrepresentations or omissions. However, the Proxy misrepresents or omits material information that is necessary for the Company's shareholders to make an informed voting decision in connection with the Proposed Transaction.

24. First, the Proxy entirely omits **any** financial projections for the UQM.

25. Concerningly, however, the Proxy states on page 27 that when preparing its valuation analyses in support of its fairness opinion, Duff & Phelps utilized "financial projections for the Company, provided to Duff & Phelps by the Company's management (the "Management Projections")."

26. Indeed, the Proxy further discloses "[f]or purposes of its discounted cash flow analysis, Duff & Phelps utilized and relied upon the Management Projections, which provided a financial forecast for the fiscal years ending December 31, 2019 through December 31, 2028," and that "the discounted cash flow analysis was used as the **primary valuation methodology**." Proxy at 30 (emphasis added). But, as mentioned above, the Proxy entirely fails to disclose the Management Projections, including UQM's projected unlevered free cash flows of the Company for the fiscal years ending December 31, 2019 through December 31, 2028, which, by Duff & Phelps' own admission, were a fundamental input underlying the **primary** valuation methodology—the discounted cash flow ("DCF") analysis.

27. Indeed, investors are concerned, perhaps above all else, with the cash flows of the companies in which they invest. Under sound corporate finance theory, the market value of a company should be premised on the expected cash flows of the corporation.

28. Additionally, the Proxy fails to disclose UQM's projected net operating loss carryforwards that were calculated by UQM management, which were utilized by Duff & Phelps in its analyses.

29. Numerous courts have championed the importance of management based financial projections because a company's management has unique insight into their firm's future that the market does not. Shareholders cannot hope to replicate management's inside view of the Company's prospects. The established case law shows the importance (and, hence, materiality) of financial projections to shareholders' decision-making.

30. Indeed, the Management Projections served as the primary reason for the Board to approve the Proposed Transaction and for Duff & Phelps to find the Merger Consideration "fair" to UQM shareholders. As a result, the Management Projections are plainly material and speak squarely to the question that the Company's shareholders must answer in determining whether to vote in favor of the Proposed Transaction: is the fixed amount of cash being offered in the Proposed Transaction more or less valuable than a continued stake in the Company? Without the Management Projections, Defendants present the Company's shareholders with only a fraction of the equation, rendering them unable to answer this question and assess the fairness of the Proposed Transaction. Thus, the omitted financial projections are plainly material to shareholders and must be disclosed.

31. With respect to Duff & Phelps' *Discounted Cash Flow Analysis*, the Proxy is materially misleading and incomplete because it fails to disclose: (i) UQM's projected unlevered free cash flows for the fiscal years ending December 31, 2019 through December 31, 2028; (ii) UQM's terminal value in 2028; (iii) the inputs and assumptions underlying the selection of UQM's terminal growth rate of 3.0%; (iv) the inputs and assumptions underlying the selection of the discount rate range used in the Stable-growth stage analysis of 20.0% to 25.0%; (v) the inputs and assumptions underlying the selection of the discount rate range used in the Normalized-growth stage

analysis of 13.0%; and (vi) the separate, final results of the High-growth stage, Stable-growth stage, and Normalized-growth stage analyses. *See* Proxy at 30-31.

32. These key inputs are material to UQM shareholders, and their omission renders the summary of Duff & Phelps' *Discounted Cash Flow Analysis* materially incomplete and misleading. As one highly-respected law professor explained regarding these crucial inputs, in a DCF analysis a banker takes management's forecasts, and then makes several key choices "each of which can significantly affect the final valuation." Steven M. Davidoff, Fairness Opinions, 55 Am. U.L. Rev. 1557, 1576 (2006). Such choices include "the appropriate discount rate, and the terminal value…" *Id.* As Professor Davidoff explains:

> *There is substantial leeway to determine each of these, and any change can markedly affect the discounted cash flow value. For example, a change in the discount rate by one percent on a stream of cash flows in the billions of dollars can change the discounted cash flow value by tens if not hundreds of millions of dollars….*This issue arises not only with a discounted cash flow analysis, but with each of the other valuation techniques. *This dazzling variability makes it difficult to rely, compare, or analyze the valuations underlying a fairness opinion* **unless full disclosure is made of the various inputs in the valuation process, the weight assigned for each, and the rationale underlying these choices**. The substantial discretion and lack of guidelines and standards also makes the process vulnerable to manipulation to arrive at the "right" answer for fairness. This raises a further dilemma in light of the conflicted nature of the investment banks who often provide these opinions.

*Id.* at 1577-78 (emphasis added). Without the above-mentioned information, UQM shareholders cannot evaluate for themselves the reliability of Duff & Phelps' *Discounted Cash Flow Analysis*, make a meaningful determination of whether the estimated enterprise value of UQM reflect the true value of the Company or was the result of an unreasonable judgment by Duff & Phelps, and make an informed decision regarding whether to vote in favor of the Proposed Transaction.

33. With respect to Duff & Phelps' *Selected Public Companies Analysis*, the Proxy fails to disclose the individual multiples Duff & Phelps calculated for each of the companies included in

the analysis. *See* Proxy at 31-32. A fair summary of the *Selected Public Companies Analysis* requires the disclosure of the individual multiples for each company utilized; providing the **combined** mean and median multiples that a banker calculated to render UQM's valuation metrics is insufficient, as shareholders are unable to assess whether the banker applied the appropriate multiples, or, instead, applied unreasonably low multiples in order to drive down the implied valuation of the Company. Indeed, Duff & Phelps considered two distinct classes of companies—the Electric Vehicle Component Manufacturers and Automotive Suppliers. However, Defendants elected to withhold from Company shareholders the separate mean and median multiples for the two separate groups of comparable companies. Accordingly, the omission of the individual multiples renders the summary of the analysis materially incomplete and misleading.

34. Similarly, Duff & Phelps' *Selected Mergers and Acquisitions Transactions Analysis* fails to disclose the individual multiples for each transaction utilized. *See* Proxy at 32-33. For the same reasons mentioned above, the failure to disclose the individual multiples for each transaction utilized, which was then used to calculate the enterprise value and various multiples for UQM, renders the summary of the analysis materially incomplete and misleading.

35. The Proxy also fails to disclose or misstate material information relating to the sales process leading up to the Proposed Transaction.

36. Specifically, the Proxy states that "two potential investors did enter into confidentiality agreements and initiated due diligence, including technical and financial diligence and several visits to the UQM headquarters" Proxy at 21. However, the Proxy fails to disclose whether the confidentiality agreements contained a standstill provision and, if so, how long the provision remained in effect, and whether the agreements contained a "don't-ask, don't-waive" ("DADW") provision, and whether such a provision fell away upon the execution of the Merger Agreement or still remained in effect. Such information is material to UQM shareholders, as it bears

directly on the ability of the two potential acquirers to offer a better deal. The failure to disclose the existence of DADW provisions creates the false impression that either of the interested parties could have made a superior proposal. **But that is not true.** If the confidentiality agreements contained DADW provisions, the interested parties could only make a superior proposal by breaching their respective agreement, because in order to make the superior proposal, they would have to ask for a waiver, either directly or indirectly. Thus, the omission of this information renders the references to the confidentiality agreements in the Proxy materially incomplete and therefore misleading as any reasonable shareholder would deem the fact that the most likely potential topping bidders in the marketplace may be precluded from making a superior offer to significantly alter the total mix of information.

37. Finally, the Proxy fails to disclose or misstate material information that materially misleads stockholders as to the potential conflicts of interest faced by Duff & Phelps.

38. Indeed, the Proxy states that "[i]n 2016, Duff & Phelps provided a fairness opinion to the Board in connection with the Company's proposed transaction with Hybrid Kinetic (the "Prior Engagement"). For the Prior Engagement, Duff & Phelps received **customary fees**, expense reimbursement, and indemnification." Proxy at 34 (emphasis added).

39. As a result, the Proxy fails to disclose the exact amount of "customary fees" that Duff & Phelps received from UQM in connection with the Prior Engagement.

40. Such information is material to UQM shareholders. Indeed, it is imperative for shareholders to be able to understand what factors might influence the financial advisor's analytical efforts. A financial advisor's own financial interest in a proposed merger must be carefully considered in assessing how much credence to give its analysis. A reasonable shareholder would want to know about any economic motivations the advisor, employed by a board to assess the fairness of the merger to the shareholders, might have. Especially when that motivation could

rationally lead the advisor to favor a deal at a less than optimal price, because the procession of a deal was more important to him than approving a deal at a truly fair price to stockholders. The omission of the exact compensation that Duff & Phelps received from the work it provided to UQM in connection with the Prior Engagement renders the Proxy incomplete and misleading.

41. Defendants' failure to provide the foregoing material information renders the statements in the Proxy false and/or materially misleading.

42. In sum, the omission of the above-referenced information renders the Proxy materially incomplete and misleading, in contravention of the Exchange Act. Absent disclosure of the foregoing material information prior to the upcoming special meeting of UQM shareholders, Plaintiff will be unable to make an informed decision regarding whether to vote her shares in favor of the Proposed Transaction, and she is thus threatened with irreparable harm, warranting the injunctive relief sought herein.

## COUNT I

**(Against All Defendants for Violations of Section 14(a) of the Exchange Act and Rule 14a-9 )**

43. Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

44. Section 14(a)(1) of the Exchange Act makes it "unlawful for any person, by the use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 78l of this title." 15 U.S.C. § 78n(a)(1).

45. Rule 14a-9, promulgated by the SEC pursuant to Section 14(a) of the Exchange Act,

provides that proxy communications shall not contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9.

46. The omission of information from a proxy will violate Section 14(a) and Rule 14a-9 if other SEC regulations specifically require disclosure of the omitted information.

47. Defendants have issued the Proxy with the intention of soliciting the Company's common shareholders' support for the Proposed Transaction. Each of the Individual Defendants reviewed and authorized the dissemination of the Proxy, which fails to provide critical information regarding, amongst other things: (i) financial projections for UQM; (ii) the valuation analyses performed by Duff & Phelps in support of its fairness opinion; (iii) the sales process leading up to the Proposed Transaction; and (iv) the potential conflict of interest Duff & Phelps faced as a result of its historical dealings with UQM.

48. In so doing, Defendants made untrue statements of fact and/or omitted material facts necessary to make the statements made not misleading. Each of the Individual Defendants, by virtue of their roles as officers and/or directors, were aware of the omitted information but failed to disclose such information, in violation of Section 14(a). The Individual Defendants were therefore negligent, as they had reasonable grounds to believe material facts existed that were misstated or omitted from the Proxy, but nonetheless failed to obtain and disclose such information to the Company's shareholders although they could have done so without extraordinary effort.

49. The Individual Defendants knew or were negligent in not knowing that the Proxy is materially misleading and omits material facts that are necessary to render it not misleading. The Individual Defendants undoubtedly reviewed and relied upon most if not all of the omitted information identified above in connection with their decision to approve and recommend the

Proposed Transaction; indeed, the Proxy states that Duff & Phelps reviewed and discussed its financial analyses with the Board, and further states that the Board considered the financial analyses provided by Duff & Phelps, as well as its fairness opinion and the assumptions made and matters considered in connection therewith. Further, the Individual Defendants were privy to and had knowledge of the projections for the Company and the details surrounding the process leading up to the signing of the Merger Agreement. The Individual Defendants knew or were negligent in not knowing that the material information identified above has been omitted from the Proxy, rendering the sections of the Proxy identified above to be materially incomplete and misleading. Indeed, the Individual Defendants were required to, separately, review Duff & Phelps' analyses in connection with their receipt of the fairness opinions, question Duff & Phelps as to its derivation of fairness, and be particularly attentive to the procedures followed in preparing the Proxy and review it carefully before it was disseminated, to corroborate that there are no material misstatements or omissions.

50. The Individual Defendants were, at the very least, negligent in preparing and reviewing the Proxy. The preparation of a proxy statement by corporate insiders containing materially false or misleading statements or omitting a material fact constitutes negligence. The Individual Defendants were negligent in choosing to omit material information from the Proxy or failing to notice the material omissions in the Proxy upon reviewing it, which they were required to do carefully as the Company's directors. Indeed, the Individual Defendants were intricately involved in the process leading up to the signing of the Merger Agreement and preparation and review of the Company's financial projections.

51. UQM is also deemed negligent as a result of the Individual Defendants' negligence in preparing and reviewing the Proxy.

52. The misrepresentations and omissions in the Proxy are material to Plaintiff, who will be deprived of her right to cast an informed vote if such misrepresentations and omissions are not

corrected prior to the special meeting of UQM's shareholders. Plaintiff has no adequate remedy at law. Only through the exercise of this Court's equitable powers can Plaintiff be fully protected from the immediate and irreparable injury that Defendants' actions threaten to inflict.

## COUNT II

**(Against the Individual Defendants for Violations of Section 20(a) of the Exchange Act)**

53. Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

54. The Individual Defendants acted as controlling persons of UQM within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their positions as officers and/or directors of UQM, and participation in and/or awareness of the Company's operations and/or intimate knowledge of the incomplete and misleading statements contained in the Proxy filed with the SEC, they had the power to influence and control and did influence and control, directly or indirectly, the decision making of the Company, including the content and dissemination of the various statements that Plaintiff contends are materially incomplete and misleading.

55. Each of the Individual Defendants was provided with or had unlimited access to copies of the Proxy and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

56. In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company, and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the Exchange Act violations alleged herein, and exercised the same. The Proxy contains the unanimous recommendation of each of the Individual Defendants to approve the Proposed Transaction. They were thus directly involved in preparing this document.

57. In addition, as the Proxy sets forth at length, and as described herein, the Individual Defendants were involved in negotiating, reviewing, and approving the Merger Agreement. The Proxy purports to describe the various issues and information that the Individual Defendants reviewed and considered. The Individual Defendants participated in drafting and/or gave their input on the content of those descriptions.

58. By virtue of the foregoing, the Individual Defendants have violated Section 20(a) of the Exchange Act.

59. As set forth above, the Individual Defendants had the ability to exercise control over and did control a person or persons who have each violated Section 14(a) and Rule 14a-9 by their acts and omissions as alleged herein. By virtue of their positions as controlling persons, these defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of Individual Defendants' conduct, Plaintiff will be irreparably harmed.

60. Plaintiff has no adequate remedy at law. Only through the exercise of this Court's equitable powers can Plaintiff be fully protected from the immediate and irreparable injury that Defendants' actions threaten to inflict.

**PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff prays for judgment and relief as follows:

A. Preliminarily enjoining Defendants and all persons acting in concert with them from proceeding with the special meeting of UQM shareholders to vote on the Proposed Transaction or consummating the Proposed Transaction, unless and until the Company discloses the material information discussed above which has been omitted from the Proxy;

B. Directing the Defendants to account to Plaintiff for all damages sustained as a result of their wrongdoing;

C. Awarding Plaintiff the costs and disbursements of this action, including reasonable

attorneys' and expert fees and expenses; and

    D.    Granting such other and further relief as this Court may deem just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury on all issues so triable.

Dated: February 25, 2019            **MONTEVERDE & ASSOCIATES PC**

By:  */s/ Juan E. Monteverde*
Juan E. Monteverde
The Empire State Building
350 Fifth Avenue, Suite 4405
New York, NY 10118
Tel:(212) 971-1341
Fax:(212) 202-7880
Email: jmonteverde@monteverdelaw.com

*Attorneys for Plaintiff*